Opinion filed February 26, 2021



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00040-CR

_____

### TODD WILLIAM BARR, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 27680A**

## M E M O R A N D U M   O P I N I O N

The jury convicted Todd William Barr of arson of a habitation, a first-degree felony. *See* TEX. PENAL CODE ANN. § 28.02(d)(2) (West 2019). The jury assessed Appellant's punishment at confinement for a term of forty years in the Institutional Division of the Texas Department of Criminal Justice and a fine of $5,000. In his sole issue on appeal, Appellant challenges the sufficiency of the evidence supporting his conviction for arson. We affirm.

*Background Facts*

At about 11:30 a.m. on July 13, 2017, Jill Phillips received a phone call at work from a security company notifying her that an alarm had been triggered for her home at 3717 Trailend Drive in Abilene. A neighbor called Jill's husband, Raymond John Phillips (John), to inform him that his house was on fire. John sent a message to Jill and informed her that the house—a mobile home that Jill had paid for and had lived in for twenty-three years—was on fire.

John left work and went home, where he found the house on fire. As firefighters fought the fire, John noticed that a propane tank was located near the back of his house. John did not own a propane tank and testified that he used a charcoal grill when he cooked outdoors.

Raymond Jernigan testified that he and his girlfriend were driving near West Lake Road and Jolly Rogers Road on the morning of July 13, 2017, when Jernigan saw a man walking quickly out of the alley. The man was wearing a hoodie so tightly around his face that Jernigan was unable to see the man's face before he entered a white car. Jernigan turned his vehicle around and stopped behind the white car at a stop sign, and his girlfriend wrote down the license plate number of the white car. On a map, Jernigan identified the alley from which he saw the man emerge. The map showed that Trailend Drive and West Lake Drive run parallel to each other and intersect Jolly Rogers Road. The map also showed that the alley behind Trailend Drive is accessible from Jolly Rogers Road.

Jernigan continued to observe the white car as it appeared to go to a hotel behind an Allsup's convenience store. After Jernigan stopped to dine at a restaurant, he observed fire trucks and police cars pass by. Jernigan returned to the area where he had seen the man and provided the license plate number of the white car to a police officer at the scene of the fire.

Officer Jeremy Nell of the Abilene Police Department was dispatched to the residential alarm call. As he approached the residence, Officer Nell observed smoke. Officer Nell advised dispatch to send the fire department, and he beat on the door of the house and yelled because he was uncertain whether the residence was occupied. However, no one responded. A large amount of smoke was rising from the back of the house, and Officer Nell secured the scene for safety while waiting for the arrival of the fire department.

When John arrived, he advised Officer Nell that he and Jill had been experiencing problems with his neighbor, Tyler Lee. Jill testified that, about one year before the fire, Lee had purchased the house next to her house and had begun storing items there. Lee allowed another couple to live on his property even though the house had no running water, electricity, plumbing, or gas. While the Phillipses were away at work, the couple would jump the fence and steal the Phillipses' water. Jill also testified that Lee had a loud truck and that, at all hours of the night, Lee would bring to the property trailers carrying vehicles and trash. Jill and John had called the city to report the problems they were having with Lee.

After the fire department arrived, Jernigan approached Officer Nell and informed the officer that he had seen the white car and provided the license plate number of the car. Officer Nell shared Jernigan's information with fire department and police department personnel, including Agent Andrew Valdez of the Abilene Police Department and Lieutenant Aaron Barr of the Abilene Fire Department. Officer Nell also broadcast the information by radio. Officer Nell informed Agent Valdez that Lee drove a white car.

Andrew Knox was an Abilene firefighter that responded to the fire. Knox considered the fire to be unusual because much of the fire was inside the walls, and it initially appeared that the fire may have started underneath the house. The fire then proceeded within the walls. When the fire crew began to fight the fire from the

back of the house, Knox saw a propane tank with a hose on it next to the corner of the house. He noticed that the propane tank was turned on. The tank had been depleted of propane. After entering the residence, the firefighters found a lot of fire in the bedroom area at the back of the house.

Lieutenant Barr is a fire investigator with the Abilene Fire Department. When Lieutenant Barr arrived, three fire engines and a ladder truck were already present, and firefighters were actively fighting the fire. A deputy fire chief advised Lieutenant Barr to speak with Officer Nell, who had some information that indicated that the fire may have had a suspicious origin. Lieutenant Barr spoke with Officer Nell and learned that witnesses had seen someone leave the alley and enter a car, which left quickly.

Lieutenant Barr's investigation revealed that the fire had been started by an outside force at the exterior of the trailer house and had not been caused by an electrical or mechanical malfunction. Lieutenant Barr explained that the photographs taken at the scene showed a V-pattern, which indicated that the fire was against the wall and burned straight up—a very good indicator that an accelerant may have been used. He also testified that the fire had burned much faster and hotter than a natural fire. Lieutenant Barr explained that the circular patterns evident in the photographs showed that the fire pattern was not normal but, rather, was indicative of a "pour pattern" of a flammable liquid. In addition to the fact that the V-pattern and the pour pattern indicated the use of an accelerant on the steps leading to the back door of the house, Lieutenant Barr further explained that the fire was also strange because it burned inward rather than outward, which is another indicator that an accelerant was used.

There was a separate fire pattern beside the propane tank that had a water hose attached to it. The hose ran from the propane tank and went under the skirting of the trailer house's siding into the void beneath the house. According to Lieutenant Barr,

4

the propane-tank pattern indicated that someone possibly had tried to light the gas coming out of the hose—like a torch—under the house. Lieutenant Barr stated that it was possible that the fire was already in progress and that an ember had landed on the hose and melted through it, but he noted that this was an unlikely scenario. He testified that the evidence indicated that gas actually was emitted from the hose. Consequently, Lieutenant Barr concluded that it was very possible that there were two different fires intentionally started on the exterior of the house.

Agent Valdez drove to Lee's home at 2002 Yorktown Drive and observed a white four-door car with the license plate number that had been provided to the police by Jernigan. However, the license plate did not actually belong to the white car.

As he conducted surveillance at Lee's residence, Agent Valdez saw a white, bald male in a pink shirt walk to the white car. The male looked up and down the street before entering the white car. At that time, a gray Dodge Durango pulled up and parked along the street. The white car backed out and followed the Dodge Durango as it traveled down back streets. Agent Valdez followed the vehicles, which eventually parked near a convenience store. He then observed that the white car was unoccupied and that the white male that had driven it got into the Durango. The Durango then returned to 2002 Yorktown, where Tyler Lee and Kory Roberts lived. Agent Valdez and another officer made contact with the subjects and determined that Lee was the driver of the Durango and that Appellant was the passenger who had driven the white car.

Although Roberts was also present at the Yorktown residence, officers initially transported only Lee and Appellant for questioning at the Law Enforcement Center. Agent Valdez, Lieutenant Barr, and Agent Ernie Moscarelli returned to the Yorktown residence, where Roberts consented to a search and pointed out some tin snips that had been used to cut the fence behind the property that burned. With help

from Roberts, the officers looked in and around the property for a black hoodie, which was not found. Roberts was then brought in for questioning.

As a result of the interviews, investigators learned that gasoline had been purchased at Allsup's, and an Allsup's security recording obtained during the investigation was admitted into evidence and published to the jury. The Allsup's security recording showed Roberts purchasing gasoline for seven dollars in cash.

Roberts was a reluctant witness at trial. He had pleaded guilty to the offense of arson, for which he received a probated seven-year sentence. Roberts explained that he had pleaded guilty because he had been involved in the arson, did not believe he could "beat it," and did not want to risk the imposition of a long prison term.

Roberts had known Appellant for ten years or more, and he was aware that Appellant had recently had heart surgery. Roberts testified that, on the morning of July 13, 2017, Appellant called and asked Roberts to give him a ride. Appellant arrived at Roberts's house at 2002 Yorktown at 7:30 or 8:00 a.m., and they left in a white car that Roberts had not seen before. Appellant told Roberts that he had something to do. Roberts drove the vehicle, and Appellant told Roberts where to go.

Roberts dropped off Appellant at the alley behind the corner of Trailend Drive and Jolly Rogers Road. He saw Appellant cut the fence to Lee's trailer with a pair of tin snips. He did not recall whether Appellant had the tin snips with him or whether they were already at the trailer. Roberts then drove to a nearby trailer. After a few minutes, Appellant called Roberts and told Roberts to return. Roberts picked up Appellant at the north end of the alley and drove to an Allsup's, where he put gasoline both in the vehicle and in an empty water bottle or milk jug or other type of container.

After they returned to Trailend Drive, Appellant exited the vehicle with the bottle of gasoline, and Roberts drove down the road. Appellant then called Roberts

again, and Roberts went to Trailend Drive where he picked up Appellant, who was wearing a hoodie but no longer had the bottle of gasoline. Roberts had noticed that Appellant had his cell phone and a bag or suitcase of clothes in the car, but he did not see a propane tank.

During the drive back to the house on Yorktown, Appellant called Lee, and Roberts heard Appellant inform Lee that Appellant had taken "care of it" or had "finished" something. Roberts testified that, after Lee arrived at the house, Lee and Appellant took the white car to the store "to get rid of it."

Roberts testified that, when he first left the house with Appellant that morning, he did not know of a plan, did not know to where he was driving, and did not know what he was doing when he drove Appellant to Trailend Drive. Roberts testified that Appellant had asked him for a ride to Lee's house "to . . . do something for [Lee] or fix something for him." Roberts was aware of the issues between Lee and the Phillipses and eventually figured out what was happening after Appellant informed Roberts that "he was going to go out there and mess [the Phillipses'] trailer up."

Roberts confirmed that he had authorized the police to photograph his cell phone, which showed his incoming, outgoing, and rejected phone calls with Appellant on July 12 and 13, 2017, including calls at 10:26 a.m., 10:27 a.m., and 10:34 a.m.—the times when Roberts was "dropping off" and "picking up" Appellant at Lee's trailer on Trailend. The photos also showed that Appellant had sent text messages to Roberts between 1:26 and 1:33 p.m., which informed Roberts that Appellant was being detained and instructed Roberts, "Lock tru[c]k," "Tell Tarah come love [sic] truck now," "Don't let them in [the] house," and "Close the door."[1] Those messages were sent after Agent Valdez had contacted Appellant and Lee.

---

[1]Roberts explained that Tarah is his wife's daughter and is Lee's girlfriend.

With his attorney's assistance, Roberts prepared an affidavit that Roberts executed in conjunction with the entry of his guilty plea. In his affidavit, Roberts stated that he and Appellant had gone to get gasoline because the propane tank was not functioning.

Sergeant Kevin Henry of the Taylor County Sheriff's Office authenticated several jail recordings that were admitted into evidence. Roberts identified the recordings of his telephonic jail conversations with Appellant. In those conversations, Appellant urged Roberts to speak with Appellant's attorney and suggested that, if Roberts would recant, the charges against Appellant would be resolved.

Neither Jernigan nor his girlfriend were able to identify Appellant or anyone else in a "one-on-one identification" of the men they saw in the white car. However, their description of the driver of the white car matched Roberts's description.

Appellant and his friend, Donna Doyle, testified on his behalf during the guilt/innocence phase of trial. Doyle testified that Appellant had been with her between 10:00 a.m. and noon on July 13, 2017. Doyle, a hairdresser, explained that she drove Appellant to 2002 Yorktown just before noon because she had an appointment scheduled at 1:00 p.m.

Appellant testified that, on July 13, 2017, he had intended to do some painting for Lee and that Roberts was supposed to pick him up that morning but did not do so. Appellant explained that his text messages with Roberts had been in reference to those matters.

Appellant was not permitted to stay at Doyle's while she was working, and as the time drew near for Doyle to leave for work, Appellant tried to reach Roberts before and after 10:00 a.m. Roberts eventually called Appellant, who advised Roberts that Doyle was preparing to leave and would take him to Roberts's house.

8

Appellant told law enforcement officers that, at the time he arrived at Roberts's house, he did not know that Roberts was home. Appellant claimed that, after he arrived, Roberts returned to his bedroom, and Appellant watched television. According to Appellant, Lee eventually called Roberts, and Roberts told Appellant, "[Lee] is on the phone and wants to know if you'll move that car out of the driveway." Later in his testimony, Appellant testified that Roberts had stated that Lee wanted to know whether "somebody" would move the car so that Lee could park his vehicle in the driveway.

According to Appellant, Roberts informed him that police officers browbeat Roberts into stating that Appellant was involved, so Roberts provided a statement to them. Appellant testified that Roberts always had intended to recant his statement implicating Appellant.

*Analysis*

In his sole issue on appeal, Appellant challenges the sufficiency of the evidence supporting his conviction. We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be

afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Appellant asserts that a reasonable doubt exists regarding his involvement in the arson. He contends that the evidence does not sufficiently link him to the fire that was intentionally started at Jill's home. Appellant asserts that the evidence fails to justify a jury's finding of his guilt beyond a reasonable doubt because of the following evidence: Jill had testified that she did not know Appellant; Lieutenant Barr initially did not consider Appellant a suspect due to Appellant's recent heart surgery; Jernigan failed to identify Appellant as the person in the black hoodie; scientific evidence linking him to the arson was lacking; and Roberts pleaded guilty to arson in exchange for a probated sentence before testifying.

10

Appellant contends that this evidence shows that his connection to the commission of the offense was too tenuous.

Section 28.02(a)(2)(D) of the Texas Penal Code provides that a person commits the offense of arson when that person starts a fire with intent to destroy or damage any habitation and knows that it is located on property belonging to another. PENAL § 28.02(a)(2)(D). To sustain an arson conviction, the State is required to show, in addition to the other elements, that the accused set the fire or was "criminally connected therewith." *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) (quoting *Bussey v. State*, 474 S.W.2d 708, 710 (Tex. Crim. App. 1972)); *see Taylor v. State*, 735 S.W.2d 930, 941–42 (Tex. App.—Dallas 1987, no pet.).

When the jury's verdict could have been based on the testimony of an accomplice, the sufficiency review must incorporate the accomplice witness rule. *Ibarra v. State*, 479 S.W.3d 481, 487 (Tex. App.—Eastland 2015, pet. ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). In this regard, Roberts was an accomplice. Article 38.14 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Thus, in order to support a conviction based upon the testimony of an accomplice, there must be corroborating evidence that tends to connect the accused with the offense. CRIM. PROC. art. 38.14; *see Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Once corroborated, testimony of an accomplice may be considered in the same manner as any other competent evidence. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

The trial court's charge contained an Article 38.14 accomplice witness instruction requiring the jury to determine if Roberts's testimony was corroborated

11

before the jury could rely on it to convict Appellant of arson. Appellant has not challenged this implied determination by the jury. In determining whether non-accomplice evidence tends to connect a defendant to the offense, the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect the defendant to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) (citing *Malone*, 253 S.W.3d at 257). The record in this case is replete with evidence tending to connect Appellant to the arson, no less of which is the fact that Appellant drove the same vehicle spotted near the fire soon afterwards in an apparent attempt to hide its location. There was also the record of phone calls and text messages between Appellant and Roberts near the time that the fire started. Accordingly, we consider Roberts's testimony in conducting our review of the sufficiency of the evidence. *See Ibarra*, 479 S.W.3d at 487.

The jury heard evidence that Appellant called Roberts, told him to drive the white car, told him where to go—specifically in the vicinity of Jill's house, and called Roberts back and told him to return to pick Appellant up. On the second trip, Appellant took a bottle of gasoline with him but did not possess it upon his return when Roberts picked him up again. Appellant then drove the white car to another location to abandon it. Roberts also heard Appellant tell Lee by phone that he had taken "care of it" or that something had been "finished." The license plate number of the white car matched the one that Jernigan had seen, but the license plate did not match the registration for that car. Lieutenant Barr also testified that Jernigan's description of the driver of the white car matched Roberts's description.

Even though Jernigan was unable able to identify Appellant prior to trial, Roberts identified Appellant as the person that intentionally set the house on fire. Agent Valdez identified Appellant as the driver of the white car as it left Lee's and Roberts's house, and as Lee's passenger upon their return to the house after leaving

the white car at a convenience store.  The jury was free to resolve any inconsistencies in the evidence, and we defer to that determination.  The jury was also tasked with resolving any questions about Roberts's credibility.  Considering the combined and cumulative force of the evidence and viewing all of the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Appellant committed the crime of arson as alleged in the indictment.  We overrule Appellant's sole issue on appeal.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


February 26, 2021

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.